UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Första AP-Fonden and Danske Invest
Management A/S, individually and on
behalf of all others similarly situated,

       Plaintiffs,

v.                             Civil No. 12-3070 (JNE/HB)
                                  ORDER

St. Jude Medical, Inc., Daniel J. Starks, John
C. Heinmiller, Eric S. Fain, Michael T.
Rousseau, and Donald J. Zurbay,

       Defendants.

---

Gregory M. Castaldo and Joshua E. D'Ancona, Kessler Topaz Meltzer & Check LLP; Gregg S.
Levin, Motley Rice LLC; and James W. Anderson, Heins Mills & Olson, PLC, appeared for the
Lead Plaintiff.

David F. Graham, Sidley Austin LLP, and Michelle S. Grant, Dorsey & Whitney LLP, appeared
for the Defendants.

---

       This is a private securities fraud case and a putative class action against St. Jude Medical,

Inc. ("SJM") and five of its officers ("Individual Defendants").  In March 2013, Första AP-

fonden ("AP1") and Danske Invest Management A/S ("Danske") were collectively appointed as

the Lead Plaintiff.  Order, Dkt. No. 38.  The Court appointed the firms of Kessler Topaz Meltzer

& Check, LLP ("Kessler") and Motley Rice LLC ("Motley Rice") as Lead Counsel and Heins

Mills & Olson, PLC ("Heins Mills") as Liaison Counsel.  *Id.* at 2-3.

       Currently before the Court is Lead Plaintiff's motion to certify a class pursuant to Federal

Rule of Civil Procedure 23(b)(3).  The proposed class consists of "all persons or entities who

purchased or otherwise acquired [SJM] common stock during the Class Period, from February 5,

2010 through November 20, 2012, and who were damaged thereby," with several exclusions.

SAC ¶¶ 330-31, Dkt. No. 111.  For the reasons set forth below, the Court grants the motion.

## I.      Background

In the Second Amended Complaint in this action, Lead Plaintiff alleges that the

Defendants made a series of false statements and materially misleading omissions regarding the

safety and reliability of two generations of leads developed and manufactured by SJM.  Leads

are custom-designed, insulated wires that connect implanted devices like a pacemaker or

defibrillator to a patient's heart, transmitting information about the heartbeat to the device and, in

turn, delivering therapeutic electrical impulses from the device to the heart.  Lead Plaintiff

alleges that Defendants' misrepresentations and omissions violated Section 10(b) of the

Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and the U.S. Securities

and Exchange Commission's ("SEC") related Rule 10b-5, 17 C.F.R. § 240.10b-5(b), and that the

Individual Defendants, as SJM control persons, further violated Section 20(a) of the Exchange

Act, 15 U.S.C. § 78t(a), in connection with those same misrepresentations and omissions.  SAC

¶¶ 338-52.  Lead Plaintiff alleges that AP1 and Danske, like other putative class members,

purchased SJM stock during the proposed class period and were harmed when the stock's price

fell after the truth was revealed through a series of partial corrective disclosures.  *E.g.*, *id.* ¶¶ 13,

19-20, 330.  On behalf of a putative class, Lead Plaintiff seeks compensatory damages and other

relief.

A thorough summary and analysis of the claims is contained in the Court's March 10,

2014 Order granting in part and denying in part Defendants' motion to dismiss Lead Plaintiff's

Amended Consolidated Complaint; familiarity with that Order is presumed.  MTD Order, Dkt.

No. 78.  In short, Lead Plaintiff alleges that in "Dear Doctor" advisory letters that SJM sent to

physicians in 2010 to 2012, quarterly and annual reports that SJM filed with the SEC between March 2010 and August 2012, and other public statements made during that time frame, SJM misleadingly represented or implied to the investing public that its development, manufacture, and marketing of two generations of leads were compliant with applicable laws and regulations, and that both generations of leads were safe and reliable. *See id.* at 14-31. The leads at issue included the following models: Riata, Riata ST, QuickSite, QuickFlex, Riata ST Optim, Durata, Durata SJ4, and QuickFlex μ. SAC ¶ 41.

## II.    Standards for Class Certification

"In order to obtain class certification, a plaintiff has the burden of showing that the class should be certified and that the requirements of Rule 23 are met." *Luiken v. Domino's Pizza, LLC*, 705 F.3d 370, 372 (8th Cir. 2013) (quoting *Coleman v. Watt*, 40 F.3d 255, 258 (8th Cir. 1994)). In exercising its "broad discretion to decide whether certification is appropriate," *id.* (quoting *Prof'l Firefighters Ass'n of Omaha, Local 385 v. Zalewski*, 678 F.3d 640, 645 (8th Cir. 2012)), the Court may be required to "resolve disputes going to the factual setting of the case, and such disputes may overlap the merits of the case," *id.* (quoting *Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir. 2005)).

Lead Plaintiff must meet all of the requirements of Rule 23(a) for class certification: numerosity, commonality, typicality, and fair and adequate representation. Fed. R. Civ. P. 23(a). It must also satisfy one of the three subsections of Rule 23(b). *In re St. Jude Med., Inc.*, 425 F.3d 1116, 1119 (8th Cir. 2005) (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997)).

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members . . . ." Fed. R. Civ. P. 23(b)(3). The predominance requirement "is 'far more demanding' than the requirement of

commonality" and "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Luiken*, 705 F.3d at 377 (quoting *Amchem*, 521 U.S. at 623-24)).  It requires the Court to conduct a limited but rigorous analysis, including of facts "behind the pleadings," to "determin[e] whether, if the plaintiffs' general allegations are true, common evidence could suffice to make out a prima facie case for the class." *Id.* (quoting *In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d 604, 618 (8th Cir. 2011)).  To be clear, it "requires a showing that questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Halvorson v. Auto-Owners Ins. Co.*, 718 F.3d 773, 778 (8th Cir. 2013) (quoting *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1191 (2013)).

In addition, to certify a Rule 23(b)(3) class, the Court must find "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy," taking into consideration, among other things, the several matters specified by the Rule.

## III.    Rule 23(a) Requirements

Lead Plaintiff has met its burden to establish numerosity, commonality, typicality, and adequacy.  Defendants do not oppose a finding on any of these prerequisites, and for the reasons below, the Court finds that each is satisfied.

First, a class must be "so numerous that joinder of all members is impracticable . . . ." Fed. R. Civ. P. 23(a)(1).  Lead Plaintiff presented evidence that during the proposed class period, over 308 million shares of SJM common stock were outstanding, with on average approximately 98 percent of the shares held by non-company-insiders.  Institutional investors held the majority of the shares, but tens of millions of shares were held by shareholders who were not institutional investors.  Further, SJM stock traded on a national exchange, the New York Stock Exchange

("NYSE"), and its weekly trading volume during the period was consistently in the tens of
millions of shares (and never less than four million).  Castaldo Decl. Ex. A ("Tabak Rpt.") ¶¶ 30,
32, 58, Exs. 3, 5, 7, Dkt. No. 183.  These facts adequately demonstrate the large volume of
investors who likely comprise the class, making joinder impracticable.  *See, e.g.*, *In re Retek Inc.
Sec. Litig.*, 236 F.R.D. 431, 434 (D. Minn. 2006).

Second, Lead Plaintiff has shown that "there are questions of law or fact common to the
class . . . ."  Fed. R. Civ. P. 23(a)(2).  "Commonality requires the plaintiff to demonstrate that the
class members 'have suffered the same injury.'"  *Luiken*, 705 F.3d at 376 (quoting *Wal-Mart
Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011)).  Common questions in this case, as in other
cases involving Section 10(b) and Rule 10b-5 allegations, include "several common questions of
law and fact concerning the falsity or misleading nature of the [] public statements made by
[SJM], the presence or absence of scienter, and the materiality of the misrepresentations, if any."
*Basic Inc. v. Levinson*, 485 U.S. 224, 242 (1988).

Third, the claims of the representative party, Lead Plaintiff, must be typical of the claims
of the class.  Fed. R. Civ. P. 23(a)(3).  To satisfy this requirement, "a class representative must
be part of the class and 'possess the same interest and suffer the same injury' as the class
members."  *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982).  "The burden is 'fairly
easily met so long as other class members have claims similar to the named plaintiff.'"  *Alpern v.
UtiliCorp United, Inc.*, 84 F.3d 1525, 1540 (8th Cir. 1996) (internal citation omitted).  Lead
Plaintiff's claims are similar to those of other putative class members.  All allegedly bought SJM
stock during the proposed class period, relying on the truth of SJM's materially misleading
statements, and were damaged when the truth came to light through a series of corrective
disclosures.

Finally, the Court is convinced that Lead Plaintiff and its counsel will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). As with Rule 23(a)'s other prerequisites, Defendants have asserted no objections to a finding of adequacy, and the Court finds nothing in the record to raise any doubts as to this point. Lead Plaintiff has "common interests with the members of the class," as explained above. *See Paxton v. Union Nat. Bank*, 688 F.2d 552, 562 (8th Cir. 1982). Moreover, this Court has already approved Lead Plaintiff's counsel to act as lead and liaison counsel "[b]ased on the experience of these firms in the prosecution of securities class actions . . . ." Mar. 15, 2013 Order 2-3, Dkt. No. 38. Lead Plaintiff and its counsel have "vigorously prosecute[d] the interests of the class" to date by, for example, preparing amended complaints and resisting Defendants' motion to dismiss. *Paxton*, 688 F.2d at 562.

Therefore, the Court determines that the proposed class meets the Rule 23(a) requirements.

## IV. Rule 23(b)(3) Requirements

The parties' sole dispute over Lead Plaintiff's motion concerns whether Lead Plaintiff has met its burden of showing that common questions of law or fact predominate over any questions affecting only individual class members. Fed. R. Civ. P. 23(b)(3). The Court will first address the parties' dispute over the predominance requirement, and then will discuss the Rule's additional superiority requirement.

### A. Predominance

The predominance analysis "begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.* (*Halliburton I*), 131 S. Ct. 2179, 2184 (2011). As noted above, the allegations in this case involve multiple common questions

regarding several elements of a Rule 10b-5 claim: whether SJM's statements contained misleading misrepresentation(s) or omission(s), whether those misrepresentation(s) or omission(s) were material, and the Defendants' scienter.  *See Basic*, 485 U.S. at 242.  The other elements in a Rule 10b-5 case are a connection between the misrepresentation or omission and the purchase or sale of a security, reliance upon the misrepresentation or omission, economic loss, and loss causation.  *Halliburton I*, 131 S. Ct. at 2184.  Assuming plaintiffs otherwise qualify for a judicial presumption called the "fraud on the market" presumption, *see infra*, they do not need to prove materiality or loss causation in order to satisfy the predominance requirement. *Amgen*, 133 S. Ct. at 1197; *Halliburton I*, 131 S. Ct. at 2186.

As for questions involving class members' economic losses, the plaintiff must "establish[] that damages are capable of measurement on a classwide basis," using a model consistent with its liability case.  *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013); *Halvorson*, 718 F.3d at 778.  In this case, Lead Plaintiff offers the expert opinion of Dr. David Tabak[1] that classwide damages will be measurable by applying a straightforward methodology based on the alleged inflation in the price of SJM common stock during the class period.  Tabak Rpt. ¶¶ 66-70.  Defendants do not contend that Dr. Tabak's proposed methodology is inadequate or that the calculation of damages should prevent the certification of a Rule 23(b)(3) class in this case.  For purposes of finding the predominance requirement satisfied in a securities fraud case, courts commonly accept methodologies similar to Dr. Tabak's proposal for determining individual damages.  *See Lumen v. Anderson*, 280 F.R.D. 451, 459 (W.D. Mo. 2012) (quoting *Schleicher v. Wendt*, 618 F.3d 679, 682 (7th Cir. 2010)) ("Because each investor's loss usually

---

[1] Dr. Tabak's qualifications include earning a Ph.D. in Economics from Harvard University and having offered expert testimony in connection with numerous securities cases. Tabak Rpt. ¶¶ 5-7.  At this juncture, Defendants do not challenge Dr. Tabak's expertise or seek to strike his reports.  Defs.' Opp. 3, 15 n.9.

can be established mechanically, common questions predominate and class certification is

routine, if a suitable representative steps forward."); *Retek*, 236 F.R.D. at 436.  The Court

accordingly determines that classwide damages will be calculable in a manner consistent with

the theories of liability in this case, and that questions involving the economic loss element

therefore do not cause individual questions to predominate.

The analysis thus far supports a finding that common questions predominate, but one key

element remains to be considered, which could tilt the scale in the other direction: reliance.

### 1.     Whether Individualized Questions of Reliance Predominate

"Whether common questions of law or fact predominate in a securities fraud action often

turns on the element of reliance."  *Halliburton I*, 131 S. Ct. at 2184.  Lead Plaintiff argues that

the Court should apply the fraud-on-the-market presumption adopted in *Basic*, 485 U.S. at 247,

and recently reaffirmed in *Halliburton Co. v. Erica P. John Fund, Inc.* (*Halliburton II*), 134 S.

Ct. 2398 (2014).  The fraud-on-the-market presumption permits a court to assume, for purposes

of certifying a Rule 23(b)(3) securities fraud class, that all putative class members relied on the

alleged misrepresentations or omissions.  *Basic*, 485 U.S. at 247.  It thereby allows a class to

overcome the problem of proving individualized reliance by each member of the proposed class,

which effectively would otherwise prevent plaintiffs from proceeding with a class action, since

individual issues would overwhelm the common ones.  *Id.* at 242.  Importantly, the presumption

is rebuttable.  *Id.* at 248; *see also Halliburton I*, 131 S. Ct. at 2185.

To invoke the fraud-on-the-market presumption, plaintiffs "must prove certain things,"

including "that the alleged misrepresentations were publicly known," "that the stock traded in an

efficient market," and "that the relevant transaction took place 'between the time the

misrepresentations were made and the time the truth was revealed.'"  *Halliburton I*, 131 S. Ct. at

2185 (quoting *Basic*, 485 U.S. at 248 n.27).  In this case, the Court is not aware of any

contention that the allegedly misleading statements were not publicly known.  The lack of debate

makes sense, given the public nature of the communications: corporate reports filed with the

SEC, widely distributed "Dear Doctor" letters, and public investor calls and presentations.

Similarly, there is no issue regarding the timing of the putative class members' transactions,

because the proposed class is defined so as to guarantee the proper timing: "all persons or entities

who purchased or otherwise acquired [SJM] common stock during the Class Period, from

February 5, 2010 through November 20, 2012, and who were damaged thereby."  Lead Plaintiff

alleges that SJM made the first allegedly misleading statement on February 5, 2010 and that the

truth was finally fully revealed on November 20, 2012, the date of the final corrective disclosure.

MTD Order 26; SAC ¶ 160.  Thus satisfied with two of the *Halliburton I* prerequisites for

applying the fraud-on-the-market presumption, the Court turns to the third: that the stock traded

in an efficient market.

*i.*      *Proof of an Efficient Market*

The parties' sole, but vigorous, disagreement over whether the presumption can apply in

this case, and thus whether the Court may certify the class, lies in whether Lead Plaintiff has

established that the stock traded in an efficient market.  In an attempt to meet its burden, Lead

Plaintiff outlines ten different factors that other courts have considered in analyzing the efficient

market question, and asserts that each factor supports a finding that SJM traded on an efficient

market during the proposed class period.  Pl.'s Br. 13-20, Dkt. No. 182.  Five of these factors are

the so-called "*Cammer* factors," derived from the widely cited opinion in *Cammer v. Bloom*, 711

F. Supp. 1264, 1286-87 (D.N.J. 1989).  Defendants do not contest that Lead Plaintiff has shown

that nine factors weigh in favor of a finding of market efficiency, although they construe them as

9

offering only indirect support.  Defs.' Opp. 13, Dkt. No. 186.  Defendants argue that Lead

Plaintiff has not established the so-called "fifth *Cammer* factor," which they assert is the only

factor that can directly show market efficiency.  Defendants maintain that this failure by itself

defeats class certification.  *Id.* at 13-15.

Lead Plaintiff bears the burden of establishing market efficiency, meaning that the stock

was traded on an "impersonal, well-developed market" in which "most publicly available

information is reflected in market price . . . ."  *Basic*, 485 U.S. at 247.  The Supreme Court has

declined to specify any particular method for proving market efficiency or to set a particular

threshold of efficiency.  *Id.* at 246 n.24, 248 n.28.  Noting that experts "acknowledge that public

information generally affects stock prices," the Supreme Court recently admonished that

"[d]ebates about the precise *degree* to which stock prices accurately reflect public information

are thus largely beside the point."  *Halliburton II*, 134 S. Ct. at 2410.  Although the Court has not

provided detailed guidance on what proof a plaintiff must offer to establish market efficiency and

invoke the fraud-on-the-market presumption, its analysis of a plaintiff's burden with regard to

proving price impact before class certification is instructive.  Price impact means "whether the

alleged misrepresentations affected the market price in the first place."  *Id.* at 2414 (quoting

*Halliburton I*, 131 S. Ct. at 2182).  Several of the prerequisites that plaintiffs must show before

certification "are directed at price impact": "that the defendant's misrepresentation was public

and material and that the stock traded in a generally efficient market."  *Id.*  The *Halliburton II*

petitioner argued that a plaintiff should have to prove price impact directly "[b]ecause market

efficiency is not a yes-or-no proposition" and so "a public, material misrepresentation might not

affect a stock's price even in a generally efficient market."  *Id.*  The Court rejected this logic,

explaining that it was for this reason that *Basic* "affords defendants an opportunity to rebut the

presumption by showing, among other things, that the particular misrepresentation at issue did not affect the stock's market price." *Id.*

Lower courts have considered a variety of factors to determine whether plaintiffs have shown market efficiency. The five *Cammer* factors are commonly analyzed: (1) a stock's average weekly trading volume; (2) the number of security analysts following and reporting on the stock; (3) the extent to which market makers and arbitrageurs trade in the stock; (4) whether the company is eligible to file an SEC Form S-3; and (5) empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price. *Cammer*, 711 F. Supp. at 1286-87; *see also, e.g.*, *In re DVI Inc. Sec. Litig.*, 639 F.3d 623, 633 n.14 (3d Cir. 2011), *abrogated on other grounds by Amgen*, 133 S. Ct. 1184 (2013); *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 205-10 (2d Cir. 2008); *In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 511 (1st Cir. 2005); *Unger v. Amedisys Inc.*, 401 F.3d 316, 323 (5th Cir. 2005); *Lumen*, 280 F.R.D. at 460; *Retek*, 736 F.R.D. at 436-37. Courts also consider the supplemental so-called "*Krogman* factors," which are (6) the company's market capitalization, (7) the bid-ask spread for stock sales, and (8) float (the percentage of shares held by the public, as opposed to insiders). *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001); *e.g.*, *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 81 (S.D.N.Y. 2015). In addition, courts may consider whether a stock exhibits "autocorrelation," measuring how predictable a stock's pricing is based on historical data; a finding of autocorrelation weighs against a market efficiency finding. *E.g.*, *DVI*, 639 F.3d at 633 n.14. Finally, many courts give great weight to the fact that a company is traded on a major exchange such as the NYSE, although the fact by itself is not determinative. *Barclays*, 310

F.R.D. at 81 (collecting cases); *Lumen*, 280 F.R.D. at 459; *see also In re NationsMart Corp. Sec. Litig.*, 130 F.3d 309, 322 (8th Cir. 1997) (not determinative).

The Eighth Circuit has not adopted any particular test for market efficiency but has guided courts toward determining whether its elements have been established through "facts showing that a large number of people could buy or sell the stock; that trading information on the stock was widely available; and that the market rapidly reflected new information in price." *NationsMart*, 130 F.3d at 322 (discussing the fraud-on-the-market presumption on a motion to dismiss).  Other circuits have cautioned that the factors listed above, although potentially helpful, are not exhaustive and should not be used as a checklist.  *E.g.*, *Local 703, I.B. of T. Grocery & Food Empls. Welfare Fund v. Regions Fin. Corp.*, 762 F.3d 1248, 1255 (11th Cir. 2014); *Xcelera.com*, 430 F.3d at 511-12 (citing *In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1, 18 (1st Cir. 2005)); *Unger*, 401 F.3d at 325.

Lead Plaintiff asserts that nine of the above-cited factors support a finding of market efficiency, relying largely on Dr. Tabak's expert opinion.  Defendants do not dispute Lead Plaintiff's conclusions as to each factor individually, but argue that even taken together, these indirect factors cannot establish market efficiency given what they claim is a failure of proof on the fifth *Cammer* factor.  In light of the lack of disputes, and based on its own evaluation of the proffered proof, the Court determines that each of the following facts supports a finding that the market for SJM stock during the proposed class period was generally efficient.  During the relevant period, SJM's stock had a high average weekly trading volume of 4.58% of shares outstanding.  Given that shares outstanding numbered in the hundreds of millions, the weekly trading volumes of SJM stock during this period were, at a minimum, over four million shares and were consistently in the tens of millions.  The stock was traded on the NYSE, a major

national exchange by any measure. At least 24 professional analysts covered SJM, issuing

hundreds of reports. Institutional investors, which held a large percentage of SJM stock, traded

actively during this period. Moreover, SJM's stock had a large float, with the vast majority of its

stock (on average, 97.8 percent of total shares outstanding) held by non-insiders. Tabak Rpt. ¶¶

20-21, 25-26, 32-33, 58, Ex. 3. These facts show that a large number of people could buy or sell

SJM stock and that trading information on the stock was widely available. *See NationsMart*, 130

F.3d at 322.

Further, SJM was eligible to file a Form S-3, Tabak Rpt. ¶ 36, which reflects the SEC's

view that information about the company is "regularly being furnished to the market through

periodic reports," is "evaluated by professional analysts and other sophisticated users," and is

easily accessible to the public, and the belief "that the market operates efficiently for these

companies . . . ." *Cammer*, 711 F. Supp. at 1284 (quoting SEC Securities Act Release No. 33-

6235, 45 Fed.Reg. 63,693 (1980), and SEC Securities Act Release No. 33-6331, 46 Fed.Reg.

41,902 (Aug. 18, 1981)). SJM also has a market capitalization in the billions of dollars, and its

stock had a narrow bid-ask spread during the relevant period. Tabak Rpt. ¶¶ 55, 57. These facts

provide some additional support for a finding of market efficiency. *E.g.*, *Barclays*, 310 F.R.D. at

79-80; *Retek*, 236 F.R.D. at 436-37; *Krogman*, 202 F.R.D. at 478. [2]

Lead Plaintiff also offers evidence to demonstrate that the market rapidly reflected new

information in SJM's stock price. *See NationsMart*, 130 F.3d at 322. First, the facts that SJM

stock had a high average weekly trading volume, a large float, and a narrow bid-ask spread, with

active institutional investor trading and a robust set of market analysts disseminating reports on

---

[2] Dr. Tabak also opined that the NYSE facilitates trading in SJM stock by assigning a "designated market maker" to effect transactions for SJM stock. Tabak Rpt. ¶ 30. The Court finds that this fact, without more, does not impact the analysis. *See Unger*, 401 F.3d at 324.

SJM, all support the inference that the active and sophisticated market for SJM stock would quickly digest material news about the company, affecting SJM's stock price.  *See, e.g.*, *Schleicher*, 618 F.3d at 684 ("Conseco was a large, well-followed firm, whose stock traded actively in a liquid market.  It comfortably meets *Basic*'s requirements.").  Further, Dr. Tabak analyzed autocorrelation and concluded that SJM stock during the period did not exhibit statistically significant autocorrelation during the proposed class period.[3]  Tabak Rpt. ¶¶ 59-63. A finding of a lack of autocorrelation may "provide some support," albeit limited, that the stock traded in an efficient market.  *Barclays*, 310 F.R.D. at 93.  Lastly, Lead Plaintiff asserts that Dr. Tabak's analysis under the rubric of the fifth *Cammer* factor establishes that the market for SJM stock during the proposed class period was efficient.  Pl.'s Br. 17-18.  Defendants, relying largely on their expert Dr. Paul Gompers, contend that the studies Dr. Tabak offers in this regard actually show that the market was inefficient, or at least fail to establish the fifth *Cammer* factor.

### ii.    Disputes Over the Fifth Cammer Factor

Defendants challenge Lead Plaintiff's evidence for the fifth *Cammer* factor on several grounds, both legal and factual.  Defendants aver that unless Lead Plaintiff can satisfy the fifth *Cammer* factor, it cannot prove market efficiency, may not invoke the fraud-on-the-market presumption, and must lose its motion for class certification.  *E.g.*, Defs.' Opp. 12-15.

In establishing its fifth factor, the *Cammer* Court opined that "[i]t would be helpful to a plaintiff seeking to allege an efficient market to allege empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in stock price."  711 F. Supp. at 1287.  That court went on to remark that this cause-and-effect relationship is "the essence of an efficient market . . . ."  *Bombardier*, 546 F.3d at 207

---

[3] Autocorrelation is also referred to as serial correlation, and the test for this characteristic is sometimes referred to as a random walk test. Tabak Rpt. 26 n.35; *Barclays*, 310 F.R.D. at 93.

(quoting *Cammer*, 711 F. Supp. at 1287). Dr. Tabak acknowledges that the fifth *Cammer* factor

"is often considered the most direct and important of the *Cammer* factors." Tabak Rpt. ¶ 38.

There is no doubt that empirical evidence of a cause-and-effect relationship is helpful for

a finding of market efficiency, but Defendants' arguments go too far. First, "helpful" does not

mean "determinative." A plaintiff's shortfall on the fifth *Cammer* factor alone does not

outweigh, as here, showings on many other relevant factors. *Barclays*, 310 F.R.D. at 86 ("[I]n

the ordinary case of a high volume stock followed by a large number of analysts and traded on a

national exchange, whether a plaintiff can satisfy *Cammer* 5 is not dispositive. Nor is an event

study[4] always necessary."); *Bennett v. Sprint Nextel Corp.*, 298 F.R.D. 498, 510 (D. Kan. 2014)

("Lead Plaintiffs are not required to provide an event study or expert testimony to show market

efficiency.") (citing *In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 609 (C.D. Cal.

2009), and *Unger*, 401 F.3d at 323 n.6); *Plumbers & Pipefitters Nat. Pension Fund v. Burns*, 967

F. Supp. 2d 1143, 1161 (N.D. Ohio 2013) (rejecting argument that "*Cammer* factors one through

four are irrelevant to the issue of the market efficiency"); *Smilovits v. First Solar, Inc.*, 295

F.R.D. 423, 437 (D. Ariz. 2013) (finding market efficiency based on plaintiffs' showing of three

*Cammer* factors, despite a "stand-off on the fifth *Cammer* factor"); *Retek*, 236 F.R.D. at 437

("[E]mpirical evidence is not necessary to demonstrate market efficiency."). As Defendants

acknowledge, the *Cammer* factors are not a checklist. *E.g.*, *Regions*, 762 F.3d at 1255.

None of the cases that Defendants cite to the contrary are binding on this Court, and in

any event, all are distinguishable. For example, *Bombardier*, which involved certificates, not

stock traded on a national exchange, does not stand for the proposition Defendants advance,

---

[4] Event studies are "regression analyses that seek to show that the market price of the defendant's stock tends to respond to pertinent publicly reported events." *Halliburton II*, 134 S. Ct. at 2415.

because its denial of class certification relied on findings that multiple *Cammer* factors—not just the fifth—fell short, as well as a finding that (unlike SJM stock) the certificates were traded infrequently. 546 F.3d at 210. Both *In re Federal Home Loan Mortgage Corp. (Freddie Mac) Sec. Litig.*, 281 F.R.D. 174, 179-82 (S.D.N.Y. 2012), and *George v. China Auto. Sys., Inc.*, No. 11 Civ. 7533(KBF), 2013 WL 3357170, at *11, *13 (S.D.N.Y. July 3, 2013), turned on concerns about serious flaws in the plaintiffs' experts' analyses; as discussed below, after considering Defendants' critiques, the Court does not share similarly grave concerns with regard to Dr. Tabak's report. Further, the court in *George* first found that the plaintiffs had failed to satisfy the adequacy and typicality requirements, making the Rule 23(b)(3) findings unnecessary to the denial of certification. *Id.* at *7. And *IBEW Local 90 Pension Fund v. Deutsche Bank AG*, No. 11 Civ. 4209(KBF), 2013 WL 5815472 (S.D.N.Y. Oct. 29, 2013), involved unique complexities because the stock in question traded primarily on an international market.

In addition, Defendants overreach in arguing that only one particular type of test can demonstrate the cause-and-effect relationship of the fifth *Cammer* factor. In this case, Dr. Tabak ran several iterations of an analysis that compared the expected price of SJM stock on what he identified as "news days" against its actual price on those days, and also compared expected against actual price on "non-news days." He then compared the percentage of news days with statistically significant returns to that of non-news days with statistically significant returns. Tabak Rpt. ¶¶ 41-51, Exs. 8a-1 to 8e. He opined that since the difference between statistically significant news days and non-news days was itself statistically significant, this analysis supported the conclusion that SJM's price was reacting to news about the company. *Id.* ¶ 48.

Defendants argue that this type of comparative analysis cannot satisfy the fifth *Cammer* factor.[5] *E.g.*, Defs.' Opp. 18-19.

Although offering only indirect proof, Dr. Tabak's comparative analysis is helpful— although by no means definitive—in showing *some* cause-and-effect relationship between news and stock price. Dr. Tabak acknowledges that the comparative analysis is a threshold test for market efficiency and does not directly prove it; he characterizes it as demonstrating that the market for St. Jude's stock reacted differently on news days than on non-news days. *See* Defs.' Opp. 20; Tabak Rpt. ¶ 48. Dr. Gompers has also employed this type of comparative analysis as an indirect test to provide evidence about whether a company's stock price responded to news during a putative class period. Expert Report of Paul A. Gompers ¶ 30, *Lumen*, 280 F.R.D. 451 (Dkt. No. 100-2). Other courts have found that this type of comparative analysis can support a finding of market efficiency. *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 430 (S.D.N.Y. 2014); *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 280 (S.D.N.Y. 2008).

Finally, Defendants argue that Dr. Tabak's analysis actually demonstrates that the market was inefficient, and that this point is critical to defeating class certification. They point out, for example, that one iteration of Dr. Tabak's comparative analysis showed that SJM stock responded to news in a statistically significant amount only 36.4% of the time. Defs.' Opp. 7, 18. But this figure (or the others Defendants cite) does not prove inefficiency. As Defendants

---

[5] Defendants critique Dr. Tabak's analysis for, among other things, not analyzing whether, on each news day that the actual price differed in a statistically significant amount from the expected price, the difference was directionally consistent with the tenor of the news. Defs.' Opp. 21-24. While this additional analysis could render an event study more helpful as direct proof of market efficiency, it is not necessary, and Dr. Tabak's study still lends some added weight to all the other support for a finding of market efficiency. Because the fifth *Cammer* factor is not determinative, a detailed response to each of Defendants' other critiques of Dr. Tabak's fifth *Cammer* factor analysis is unnecessary. Suffice it to say that although Defendants have raised questions that might serve as good fodder for a cross-examination of Dr. Tabak, they did not succeed in their attempts to discredit his analysis entirely.

themselves acknowledge, there may be explanations for the lack of movement on news days that are consistent with market efficiency.  For example, if the "news" on a news day was coverage of an issue already disclosed (that is, stale news), or if there was confounding news issued on the same day, economists might not expect price movement.  *Id.* at 24; Grant Decl. Ex. E ("Gompers Rpt.") ¶ 25, Dkt. No. 187; *see also McIntire*, 38 F. Supp. 3d at 430.  Notably, Defendants' expert did not opine that Dr. Tabak's analyses proved inefficiency.  Rather, Dr. Gompers opined that Dr. Tabak's analysis cannot "by itself" demonstrate market efficiency, and that more analysis is needed to be able to conclude whether the stock traded efficiently.  Gompers Rpt. ¶¶ 20, 22-23, 25, 33-34.  A study's failure to conclusively prove efficiency, however, is different from proving inefficiency.

In contending that Dr. Tabak's analysis fails to prove the requisite cause-and-effect relationship and that, without a full-blown event study, Lead Plaintiff cannot meet its burden to qualify for the fraud-on-the-market presumption, Defendants ask this Court to impose a burden on plaintiffs that the law does not mandate.  Although it is the plaintiff's burden to demonstrate market efficiency, there is no rule that a plaintiff must present direct evidence in the form of a particular type of event study and cannot instead rely on indirect proof.  To hold otherwise would require plaintiffs to present expert evidence akin to that needed to prove price impact—a requirement that the *Halliburton II* Court refused to impose, absent rebuttal evidence from defendants.  134 S. Ct. at 2414.[6]  Further, requiring Lead Plaintiff to offer an event study, before certification, showing that a stock's price responded to news at some specific rate would ignore

---

[6] Indeed, imposing the requirement Defendants seek would appear to be a greater burden than the rejected price impact requirement.  *See* Brief of Law Professors as *Amici Curiae* in Support of Petitioners at 24, *Halliburton II*, 134 S. Ct. 2398 (2014) (No. 13-317).

the Supreme Court's recognition that "[d]ebates about the precise *degree* to which stock prices accurately reflect public information" are "largely beside the point." *Id.* at 2410.

Defendants could have submitted rebuttal evidence in the form of an affirmative event study by Dr. Gompers. If they had, perhaps Lead Plaintiff would have submitted a report reaching a contrary conclusion using the methodology Defendants advocate. But Defendants did not, and through facts bearing on the many factors discussed above, Lead Plaintiff has presented indirect but adequate proof that the market for SJM stock during the putative class period was efficient. The Court therefore applies the fraud-on-the-market presumption and finds that Rule 23(b)(3)'s predominance requirement has been met.

### 2.  *Affiliated Ute* Presumption

As an alternative to the fraud-on-the-market presumption, Lead Plaintiff argues that it is entitled to a different presumption of reliance pursuant to *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). Because the Court finds that Lead Plaintiff has met its burden to invoke the fraud-on-the-market presumption, it does not reach this question.

### B.  Superiority

The Court also concludes that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The prohibitive costs of prosecuting a securities class action like this one, compared to the relatively small potential recoveries, make it unlikely that class members would want or be able to prosecute their claims on an individual basis, or that it would be more efficient for them to do so. *See Retek*, 236 F.R.D. at 437. Consistent with that observation, the Court is unaware of any other similar actions being litigated by putative class members. The Court is also unaware of any objections to concentrating the

litigation in this forum and does not believe this class action will present any unusual case

management difficulties.

For these reasons, the Court concludes that Rule 23(b)'s requirements are met.

**V.      Class and Class Counsel**

The Court accordingly certifies the following class:

All persons or entities who purchased or otherwise acquired St. Jude Medical, Inc.
stock during the Class Period, from February 5, 2010 through November 20,
2012, and who were damaged thereby, excluding (i) Defendants; (ii) members of
the immediate family of each of the Individual Defendants; (iii) any person who
was an executive officer and/or director of St. Jude Medical, Inc. during the Class
Period; (iv) any person, firm, trust, corporation, officer, director, or any other
individual or entity in which any Defendant has a controlling interest or which is
related to or affiliated with any of the Defendants; and (v) the legal
representatives, agents, affiliates, heirs, successors-in-interest or assigns of any
such excluded party.

For the same reasons that the Court finds that Rule 23(a)'s typicality and adequacy

requirements are satisfied, *see supra*, and pursuant to Rule 23(g), the Court now certifies AP1

and Danske as class representatives and appoints Kessler and Motley Rice as lead class counsel

and Heins Mills as liaison counsel for the class.  The Court notes that no objections to Lead

Plaintiff or its counsel have been lodged.

## CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT

IS ORDERED THAT:

1.      Lead Plaintiff's Motion to Certify Class, Appoint Class Representatives, and
        Appoint Class Counsel [Docket No. 180] is GRANTED.

2.      The Court DIRECTS the parties to provide notice of the pendency of this action
        to the class as required by Fed. R. Civ. P. 23(c)(2)(B).

Dated: December 22, 2015                        s/ Joan N. Ericksen
                                                JOAN N. ERICKSEN
                                                United States District Judge